IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| HEALTH ALLIANCE PLAN OF MICHIGAN, HAP PREFERRED, INCORPORATED, and ALLIANCE HEALTH AND LIFE INSURANCE COMPANY, | ) ) ) ) ) Civil Action No: |
| Plaintiffs, | ) ) **COMPLAINT** |
| v. | ) ) **DEMAND FOR JURY TRIAL** |
| BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY, a Michigan mutual insurance company, | ) ) ) ) ) |
| Defendant. | ) ) |

Health Alliance Plan of Michigan, HAP Preferred, Incorporated, and Alliance Health and Life Insurance Company (collectively "HAP") bring this action against defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company, the successor in interest to Blue Cross Blue Shield of Michigan (collectively "Blue Cross") based on the following allegations:

## Introduction

1.      Blue Cross, the dominant provider of health insurance in Michigan for decades, implemented a scheme to protect its dominant position and thwart competition from HAP and other competitors.  Blue Cross entered into **"MFN plus"** contracts with hospitals under which hospitals were required to increase the

8287275.44

rates they charged to Blue Cross' competitors. Blue Cross took such actions willfully, to maintain and enhance its monopoly power and to suppress free competition. The MFN plus clauses prevented Blue Cross' competitors from purchasing hospital services at prices that were more competitive with Blue Cross.

2.     Much of the cost of Blue Cross' scheme fell on employers and consumers in Michigan. Likewise, Blue Cross pushed its competitors' premiums higher by forcing hospitals to increase the rates they charged to those competitors.

3.     Under some of Blue Cross' exclusionary MFN plus contracts, hospitals were required to charge HAP (and others) substantially more than Blue Cross – as much as 39 percent more. Blue Cross' use of MFN plus provisions reduced competition in the sale of health insurance in the relevant market by inhibiting hospitals from negotiating competitive contracts with Blue Cross' competitors.

4.     Blue Cross capitalized on its exclusionary behavior by emphasizing to customers and prospective customers that Blue Cross possessed a purchase price advantage over its competition. Blue Cross referred again and again to its better discounts from providers in its sales communications to customers, to agents, and to consultants.

5.     In 2013, the State of Michigan prohibited the use of most favored nations clauses as possible violations of the Michigan Insurance Code.

2

Nevertheless, Blue Cross' use of MFN plus clauses in the 2007-2012 period caused substantial damage to HAP, other insurers, and to consumers.  Blue Cross' actions unreasonably restrained trade and monopolized commerce in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, § 2, and Sections 2 and 3 of the Michigan Antitrust Reform Act, MCL 445.772-3, and tortiously interfered with HAP's relationships and reasonable expectancies with its customers, prospective customers and with insurance agents.  HAP has been substantially damaged thereby.  Though the MFN plus clauses no longer exist, the damage to HAP and others they have caused, and the harm to competition, are still continuing.

### Blue Cross

6.     Blue Cross is by far the largest provider of commercial health insurance in Michigan with more than 4 million Michigan subscribers, and has been for many years.  Blue Cross competes with for-profit and nonprofit health insurers.  Blue Cross' revenues are more than ten times greater than those of HAP. Blue Cross had revenues in excess of $20 billion in 2012.

7.     Blue Cross is also the largest non-governmental purchaser of health care services, including hospital services, in Michigan.  As part of its provision of health insurance, Blue Cross purchases hospital services on behalf of its insureds from all 155 Michigan hospitals.  In 2012, Blue Cross purchased more than $18 billion annually in health care services.

8287275.44

8.      In its sales documents, Blue Cross has boasted of an "unmatched number of providers. . ."  It has also stated that "no competitor can match the strength of our provider networks."  Blue Cross has also stated in its sales documents that "[n]o competitor can match [Blue Cross'] overall network . . ."

9.      Blue Cross Blue Shield of Michigan Mutual Insurance Company received its authorization from the Department of Insurance and Financial Services (DIFS) to operate as a domestic insurer in the State of Michigan on September 6, 2013.

10.      On December 31, 2013, Blue Cross Blue Shield of Michigan merged with Blue Cross Blue Shield of Michigan Mutual Insurance Company, and Blue Cross Blue Shield of Michigan Mutual Insurance Company remained as the surviving company.  The assets and liabilities of Blue Cross Blue Shield of Michigan transferred to Blue Cross Blue Shield of Michigan Mutual Insurance Company.  Under the merger, Blue Cross Blue Shield of Michigan Mutual Insurance Company assumed the performance of all contracts and policies of Blue Cross Blue Shield of Michigan that existed as of December 31, 2013, and Blue Cross Blue Shield of Michigan Mutual Insurance Company continues to conduct business as Blue Cross Blue Shield of Michigan.  References herein to Blue Cross therefore refer to both Blue Cross Blue Shield of Michigan Mutual Insurance Company, and Blue Cross Blue Shield of Michigan, since the Defendant Blue

8287275.44

Cross Blue Shield of Michigan Mutual Insurance Company is responsible for the actions described herein prior to December 31, 2013, of Blue Cross Blue Shield of Michigan.

### The MFN Plus Clauses

11.     From the mid-2000s until 2013 (the "relevant period"), Blue Cross included MFNs (sometimes called "most favored pricing," "most favored discount," or "parity" clauses) in many of its contracts with hospitals.  Blue Cross entered into two types of MFNs, which required a hospital to provide services to Blue Cross' competitors at either (a) higher prices than Blue Cross pays, or (b) at prices no less than Blue Cross pays.   Most significantly, Blue Cross' MFNs included agreements with 22 hospitals that required the hospital to charge some or all other commercial insurers more than the hospital charged Blue Cross, typically by a specified percentage differential.  These "MFN plus" clauses required that some hospitals charge Blue Cross' competitors as much as 39% more than they charge Blue Cross.

12.     Blue Cross' MFN plus clauses guaranteed that Blue Cross' competitors could not obtain hospital services except at prices substantially greater than the prices Blue Cross paid.  Since hospital costs are the single greatest expense for health insurers, this substantially impeded the ability of insurers such as HAP to compete effectively with Blue Cross on price.

5

13.    In many instances, Blue Cross obtained protection from competition by requiring hospitals to raise the minimum prices they could charge to Blue Cross' competitors. Blue Cross has not sought or used MFN plus clauses to lower its own cost of obtaining hospital services.

14.    Blue Cross' MFN plus contracts stifled competition in the provision of hospital and health insurance services throughout Michigan. Blue Cross' exclusionary contracts (a) inflated prices paid to hospitals by Blue Cross' competitors, including HAP, and the customers they serve; (b) decreased the variety and quality of health plans available to Michigan purchasers; (c) often had the effect of increasing the prices Blue Cross' own customers must pay; and (d) substantially injured HAP's business.

## Plaintiffs

15.    Plaintiff Health Alliance Plan of Michigan provides health insurance services (primarily through its health maintenance organization), based in Detroit, Michigan, in this District.

16.    HAP Preferred, Incorporated is a "preferred provider network" that leases its network of contracted hospitals and physicians to third-party administrators, self-insured entities, and out of area payors who desire to be able to contract with a network of providers for their employees and subscribers without the need to develop a network on their own through direct contracting.  HAP

Preferred, Incorporated is a wholly owned subsidiary of Health Alliance Plan, also based in Detroit, Michigan, in this District.

17.   Alliance Health and Life Insurance Company is a health insurer which contracts with hospitals and other health care providers in order to provide health care to its insureds.  Alliance Health and Life Insurance Company is also a wholly owned subsidiary of Health Alliance Plan, based in Detroit, Michigan, in this District.

18.   HAP brings this action pursuant to Section 4 and Section 16 of the Clayton Act, 15 U.S.C. § 15, based on injuries HAP has suffered as a result of Blue Cross' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, § 2, pursuant to Sections 2 and 3 of the Michigan Antitrust Reform Act, MCL 445.772-3 and for tortious interference with prospective advantage.  HAP brings its claims both as a purchaser of health care services from hospitals and other providers, and as a competitor in the sale of health insurance.

## Jurisdiction And Venue

19.   This Court has subject matter jurisdiction over this action and jurisdiction over the defendant pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Section 4 of the Clayton Act, 15 U.S.C. § 15.

20.   Blue Cross and HAP have been engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged

8287275.44

herein substantially affects interstate commerce.  Among other things, increased prices for hospital services caused by Blue Cross' MFN plus contracts were in many cases paid by health insurers and self-insured employers across state lines. Such increases in interstate payments involved at least tens of millions of dollars. By increasing the costs to Blue Cross' payor competitors, the MFN plus contracts significantly impacted the products and prices those payors could offer to their numerous actual and potential customers based in Michigan, as well as to substantial numbers of their other customers based in other states who pay for health care services in Michigan.  Moreover, both HAP and Blue Cross provided health insurance services to substantial numbers of Michigan residents when they traveled across state lines, purchased millions dollars of health care in interstate commerce when Michigan residents required health care out of state, and received millions of dollars of payments from substantial numbers of customers located outside Michigan.

21.    Blue Cross has maintained its principal place of business and transacts business in this District, and is subject to the personal jurisdiction of this Court. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22.  Blue Cross developed its MFN policy in substantial part in this District, and entered into contracts containing MFNs with hospitals in this district and elsewhere.  HAP has also maintained its principal place of business in this District,

and suffered the bulk of its damages in this District.  The relevant markets are in this District.

### Relevant Product Markets

22.    Sale of commercial health insurance (including, among others, HMO products, PPO products, POS products, indemnity insurance and self-insurance) is a relevant product market.  Commercial health insurance is viewed as essential by subscribers in order to finance the cost of health care.  HAP is a participant in this relevant market.  Commercial health insurance is often provided by employers to their employees as part of employees' compensation.   Commercial health insurance includes self-insurance arrangements engaged in by employers.  Blue Cross, HAP and other insurers (including Aetna, Priority, Health Plus, McLaren Health Plan and others) serve self-insured employers in the relevant market by providing them with administrative services, including, most significantly, access to the insurer's provider network (including hospitals, physicians and other health care providers) at the rates negotiated by the insurer.

23.    Commercial health insurance excludes government programs such as Medicare and Medicaid, and other products offered by health insurers such as Medicare Advantage that are not available to individuals who do not qualify for Medicare or Medicaid.  Medicare and Medicaid are not substitutes for commercial health insurance for the vast majority of individuals who do not qualify for these

8287275.44

federal programs.  For all these reasons, there are no substitutes for commercial health insurance for individuals who do not qualify for Medicare or Medicaid.

24.    Commercial health insurers compete based on their service, on the breadth and quality of their provider networks, on premiums, and on the customer's cost of using providers, among other factors.  Most employers and insureds consider an insurer's provider network to be an important element of a health insurance product, because the network specifies the physicians and hospitals to which patients can turn for service with substantially lower costs to themselves.

25.    Purchasing hospital services directly without commercial insurance, rather than through a commercial insurer, is typically prohibitively expensive and is not a viable substitute for groups or individuals.  Patients without health insurance almost never purchase hospital services directly from hospitals at prices comparable to prices paid by health insurers.

26.    Another relevant market is the market for hospital services sold to, and purchased by, commercial third party payers ("hospital services").  HAP is a participant in this relevant market.  Hospital services encompass a broad cluster of medical and surgical diagnostic and treatment services that include a hospital stay, including, but not limited to, many emergency services, internal medicine services, and surgical procedures.

10

27.    The hospital services market does not include services provided outside of hospital facilities, because such services are largely offered by a different set of competitors under different competitive conditions.  Health care services not provided in a hospital are not reasonably interchangeable with most hospital services, and health plans could not substitute other services for most hospital services in response to a small but significant price increase. Most conditions that require hospital treatment cannot be effectively treated outside of a hospital.  Health insurers could not successfully market health insurance plans without including a significant number of hospitals in their networks and (as is confirmed by Michigan insurers' websites) no health insurers operating in Michigan do so.  As a result, a hypothetical monopolist which controlled all hospitals could profitably increase rates by at least a small but significant amount.

28.    The relevant market does not include hospital services paid for by Medicare or Medicaid, because these government programs fix their fees and therefore do not compete for these services.  A hospital could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled or underprivileged. Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to commercial insurers for hospitals seeking to sell their services.

8287275.44

## Relevant Geographic Markets

29.     Markets for hospital services and for commercial health insurance, including access to a provider network, are local.  Because patients typically seek medical and hospital care close to their homes or workplaces, they strongly prefer health insurance plans that provide access to networks of hospitals and physicians close to their homes and workplaces.  Employers offering health insurance to their employees therefore demand insurance products that provide access to health care provider networks in all the areas in which substantial numbers of their employees live and work. Individuals purchasing individual health insurance likewise demand insurance products that provide access to health care provider networks, including hospitals, in the areas in which they live.

30.     Oakland County is a relevant geographic market in this case with respect to each relevant product market.  Individuals living in Oakland County and their employers seek local health care, including local hospitals, and demand that the leading hospitals in Oakland County be included in their health insurance coverage as "in-network" providers.  A health insurer could not successfully sell health insurance products to employers with significant numbers of Oakland County employees without including a substantial choice of Oakland County providers, including leading Oakland County hospitals, in its network.  Therefore, hospitals outside of Oakland County are not reasonable substitutes for those within

12

the county.   It is very important to patients that their hospital services are conveniently located and readily accessible.

31.    As a result, health plans operating in Oakland County and offering health insurance to employers with significant numbers of Oakland County residents must include hospitals from Oakland County in order to meet their members' needs, and (as is confirmed by their websites) all health plans operating in the area do so.   Thus, a hypothetical monopolist that controlled all of the hospitals in Oakland County could profitably increase rates by at least a small but significant amount.   Similarly, a health insurer that was unique in offering in-network hospital providers in Oakland County could profitably raise its rates by at least a small but significant amount.

32.    In particular, health insurers could not successfully market health insurance plans to employers with significant numbers of Oakland County employees without including in their networks the hospital systems which were subject to MFN plus clauses.   These are among the leading hospitals in Oakland County and are preferred by many Oakland County residents.

33.    Similarly, employers with significant numbers of Oakland County employees would not offer their employees only health insurers without significant numbers of Oakland County hospitals in their networks.   Employees expect their health care coverage to include convenient local providers, including local doctors

and hospitals.  In HAP's experience, all or virtually all employers with significant numbers of Oakland County employees utilize health plans which operate in Oakland County and which offer networks including significant numbers of Oakland County providers, including hospitals.  As a result, an insurer that was a hypothetical monopolist in Oakland County could profitably raise rates by at least a small but significant amount.

## Blue Cross' Monopoly Power

34.    Blue Cross has during the relevant period, and does today, possess monopoly power in the sale of commercial health insurance in the relevant geographic market, and has monopsony power in the purchase of hospital services sold to commercial insurers in the relevant geographic market.  Blue Cross is far and away the largest provider of health insurance in Michigan, with market shares in the relevant markets and throughout most of Michigan several times that of its largest competitors.   According to American Medical Association ("AMA") analyses, Blue Cross has had a 69% share of Michigan's overall commercial health insurance market.  This share has exceeded 70% in the Warren-Farmington Hills-Troy metropolitan division (including Oakland and Macomb counties).  Blue Cross possessed a share of the purchases in the relevant hospital services market very similar to its share of the relevant commercial insurance market (and also several times that of its closest competitor), since the purchasers in one relevant market are

14

sellers in the other. Market shares of this magnitude create an inference of monopoly power. Also according to the AMA, Michigan has had the third least competitive commercial health insurance markets in the nation.

35. There are substantial barriers to entry which prevented any timely entry by new competitors or expansion by existing competitors into the relevant health insurance market. These barriers prevented any entry or expansion which might otherwise have been sufficient to offset the anticompetitive effects of Blue Cross' MFN plus clauses or its monopoly power. Such entry would require, among other things, the assembly of an extensive network of local hospitals and physicians in order to be able to provide convenient care to potential subscribers from their preferred, local providers. The assembly of such a network is both difficult and highly time-consuming (especially for new competitors), often taking years to achieve. Entry would also require establishment of a known brand and reputation for reliable service, which also typically takes years. Additionally, a successful entrant or competitor engaged in successful expansion would need to be able to contract with such providers at rates that are competitive with the established, dominant competitor, Blue Cross. The leverage provided by Blue Cross' MFN plus clauses has precluded such actions.

36. The inference of Blue Cross' monopoly power arising from its market share is also corroborated by Blue Cross' demonstrated ability to exercise that

8287275.44

monopoly power by, among other things, raising prices and excluding competitors through the use of its MFN plus clauses.  Additionally, Blue Cross' extensive advertising has also given it substantially greater brand identification than possessed by other, competing health insurers.  In one 2008 sales document, Blue Cross boasted of its "brand recognition" resulting from "the most widely recognized health care cards in the industry."  Moreover, Blue Cross has much broader representation among health insurance agents than do any of its competitors.

37.    By virtue of all these advantages, including its very high market share, substantially greater volume of purchases than other commercial insurers, its MFN plus clauses, as well as the substantial barriers to entry described above, Blue Cross has had the power to raise prices above competitive levels and to reduce and exclude competition.

## **Anticompetitive Effects**

38.    Blue Cross contracted for MFN plus clauses with at least 22 Michigan hospitals, including, among others, hospitals in Oakland County, Michigan.  Most of Blue Cross' MFN plus clauses require the hospital to "attest" or "certify" annually to Blue Cross that the hospital is complying with the clause, and they often give Blue Cross the right to audit compliance.

39.     The basic economics of the MFN plus clauses made higher prices, and therefore anticompetitive effects, highly likely in those areas where Blue Cross possessed a dominant or commanding market position.  Blue Cross has been by far the largest single commercial payor, contracting with virtually every Michigan hospital.  As a result, a hospital constrained by an MFN plus clause and facing the opportunity to compete for another payor at a price too close to Blue Cross' price faced an untenable choice.  If it cut prices to the competing, smaller payor, it would gain the margin associated with the new business but have to give away margin (by lowering Blue Cross' price in an amount sufficient to maintain the agreed upon gap) on the much larger volume of Blue Cross business.  No rational hospital would do so.  As a result, MFN plus provisions created a floor under many provider prices.

40.     The MFN plus clauses created an incentive for providers to charge higher prices to Blue Cross (and to its self-insured customers and subscribers paying copayments and deductibles) as well as to competitors.  As an economic matter, the Blue Cross price advantage likely to accrue from the MFN plus clauses would generally be expected to increase Blue Cross' profits, even if it was accompanied by an overall increase in hospital prices (including the prices paid by Blue Cross).  As a result, assured that the prices paid by its competition for hospital services were far higher than its own, Blue Cross did not have the same incentive

to aggressively negotiate lower prices from hospitals subject to MFN plus clauses. In fact, Blue Cross pressured hospitals by demanding lower prices if they were unwilling to provide MFN plus clauses.  The result was higher rates, not only for Blue Cross' competitors (including HAP) and their self-insured employer customers and subscribers, but also for Blue Cross and its own self-insured employer customers and subscribers.

41.    In fact, the MFN plus clauses caused pricing differentials between Blue Cross and its competitors that were even greater than the stated amounts in the agreements.  That is because, given the complexities of hospital pricing, many hospitals maintained a "cushion" over the requirements of the MFN plus clauses in their contracting to avoid any dispute about their compliance with the clauses.

42.    Blue Cross' spokesman Andrew Hatzel said in a public statement that Blue Cross used most favored nations clauses as leverage in its reimbursement arrangements.  While Blue Cross characterizes the results as procompetitive, these statements constitute an admission by Blue Cross that its MFN plus clauses had an impact on the market.  Contrary to Blue Cross' assertions, their impact was in fact anticompetitive.

43.    Blue Cross thus utilized its monopoly power to achieve these results in two ways.  First, Blue Cross was able to demand that many hospitals adopt MFN plus clauses because of the huge volume of purchases it made from these hospitals

as their primary commercial customer by a large margin.  Second, because of this huge volume, as described above, hospitals had a very strong incentive to respond to the MFN plus clauses by raising prices (or resisting price cuts) to Blue Cross' competitors rather than lowering prices to Blue Cross.

44.    Blue Cross' MFN plus clauses were completely exclusionary.  They impeded and foreclosed competition by competing insurers.  By generally causing prices to increase, not decrease, they harmed competition.

45.    The MFN plus clauses did not involve the use of a superior product, unusual business acumen or historical accident.  They did not in any way improve hospital quality or cut hospital costs.  As a result, they involved an effort to exclude competition on a basis other than efficiency.

46.    Blue Cross used its MFN plus clauses to maintain its monopoly power and to stymie efforts by HAP and others to more effectively compete.  Blue Cross' actions were thus taken only to prevent competition, and to maintain and enhance Blue Cross' monopoly power in the commercial insurance relevant market.  Blue Cross' actions impaired competition, and were exclusionary and anticompetitive.

47.    As Blue Cross acknowledged in 2010, its membership declined over the previous two years, while membership in competing payors increased.  Blue Cross' use of MFN plus provisions acted as an impediment to further increases in

competition in the market, interfering with entry and with expansion by smaller competitors, including HAP.

48.   The MFN plus clauses caused price increases in the relevant commercial insurance markets.   The most important element of costs to a health insurer is the cost of paying for health care services, including, most significantly, hospital services.   By increasing the prices charged by hospitals to competing insurers, including HAP, Blue Cross' MFN plus clauses increased the premiums that those insurers were required to charge and thereby harmed both those insurers and the purchasers of commercial health insurance.   Blue Cross thus effectively used its MFN plus clauses as a fulcrum to injure both competing purchasers in the relevant hospital services market and competing sellers in the relevant commercial insurance market, as well as to harm competition in both markets.

49.   This caused great harm to the few competitors providing any constraint on Blue Cross' monopoly power, including HAP.   Market studies have shown that cost is the clear driver of market opportunity, and is the number one concern for health insurance agents and employers.

50.   Some of the other effects of Blue Cross' MFN plus clauses have been as follows:

      a.   Preventing HAP and other Blue Cross rivals from negotiating with hospitals to obtain lower prices, thus inflating Blue Cross'

rivals' costs and reducing their ability to compete against Blue Cross. In the words of one court decision, Blue Cross effectively imposed a tax on the services of the affected providers;

b.      Maintaining a significant differential between Blue Cross' hospital costs and its rivals' costs (including HAP's) at important hospitals, which prevented those rivals (including HAP) from lowering their hospital costs, lowering their premiums, and becoming more significant competitive threats to Blue Cross;

c.      Establishing a price floor below which important hospitals would not be willing to sell hospital services to other managed care companies, including HAP, and thereby blunting "purchase price" competition among managed care companies;

d.      Raising the price floor for hospital services to all managed care companies, including HAP and, as a result increasing the premiums paid by consumers for commercial health insurance;

e.      Limiting the ability of competing managed care companies, including HAP, to compete with Blue Cross by raising their costs as well as imposing barriers to entry and expansion and

21

preserving Blue Cross' dominant market position; and

f.     Increasing hospital prices to Blue Cross and HAP self-insureds and subscribers (to the extent of their co-pays and deductibles).

51.     Blue Cross knew that its MFN plus clauses provided a competitive advantage against other health insurers. Blue Cross noted in April 2009 that its "medical cost advantage, delivered primarily through its facility [i.e., hospital] discounts, is its largest source of competitive advantage," and earlier stated that its advantages in hospital discounts "have been a major factor in its success in the marketplace."

52.     In fact, Blue Cross touted its competitive advantage in provider prices throughout its sales materials.  For example, in one 2008 proposal, Blue Cross stated that "no competitor can match the . . . claims dollar savings" offered by Blue Cross.  Blue Cross boasted in another sales document prepared for its sales representatives and agents that it offered "the deepest negotiated medical provider discounts in Michigan."  It referred to itself as "Michigan's leader in delivering the deepest provider discounts."  It stated that it had validated these claims through a "data warehouse of more than $700 million worth of Blue Cross Blue Shield commercial book of business historical claims data."  It asserted that its advantages in provider discounts over its competition created a payment savings of more than 20% for its subscribers in the Detroit area who rejected its competitors.  These

advantages touted by Blue Cross existed in substantial part because of the MFN plus clauses.

53.    Neither hospital entry nor expansion by any hospital could have timely or sufficiently deterred or counteracted the harm to competition in the relevant markets or Blue Cross' monopsony power.   New hospital entry or significant expansion would not be timely. Construction of a new general acute-care hospital would take more than two years from the initial planning stages to opening doors to patients.  Entry and expansion are also unlikely due to very high construction costs, operating costs, and financial risk.  Moreover, construction of new hospitals, and many forms of expansion of existing hospitals, are governed by state certificate of need regulations which make such entry and expansion of existing hospitals both unlikely and extremely costly and time consuming.

### Damages To HAP And Additional Anticompetitive Effects

54.    But for the MFN plus clauses, HAP would have been significantly more successful in obtaining business in the relevant market.  Consumer surveys during the relevant period demonstrate that HAP HMO received substantially better consumer ratings than did Blue Care Network, both for the health plan, and for the overall health care provided.  In fact, HAP ranked highest in consumer satisfaction in Michigan in member satisfaction during the period covered by the MFN plus clauses.  Purchasers of commercial health insurance, and competition in

the relevant health insurance market, have thus been harmed by the reduced price competitiveness of HAP's superior products, which are highly desired by many employers and consumers.  The use of the MFN plus clauses have thereby severely interfered with customer choices.

55.     HAP has suffered very significant damages from the use of MFN plus clauses by Blue Cross, in several respects.  First, the use of the MFN plus clauses has caused HAP to pay substantially more for hospital coverage for its members. HAP's rates increased substantially at hospitals in the relevant market with MFN plus clauses after the MFN plus clauses took effect, and have remained at very high (and increasing) levels ever since that time.  Indeed, after the advent of the MFN plus clauses, HAP suffered what it called an "unprecedented increase" in rates at affected hospitals.  One hospital's rates increased shortly after it was acquired by an entity subject to an MFN plus clause and thus became subject to that clause.

56.     But for the MFN plus clauses, the purchase price differential faced by HAP and Blue Cross would have narrowed considerably during the relevant period.  During that period, Blue Cross' volume declined, while HAP's sales volume grew, fueled by its outstanding customer service and emphasis on broader product offerings.  HAP expanded its local provider network as well as its national network for members needing health care when outside of Michigan, established

24

relationships with additional insurance agents and offered employers more product options. This should have significantly improved HAP's bargaining power with suppliers, including hospitals, relative to Blue Cross. The MFN plus clauses prevented HAP from reaping the benefits of its greater efficiency in the market place.

57.    Second, HAP has suffered substantial lost sales as a result of its inability to fully compete on price with Blue Cross, due to Blue Cross' purchase price advantage accentuated by its MFN plus clauses with hospitals. These lost sales (which substantially exceeded losses in other markets less affected by the MFN plus clauses) have included both existing accounts lost to Blue Cross and accounts that HAP would have otherwise obtained.

58.    These losses in the relevant market occurred despite the fact that HAP's overall sales and customer retention were increasing due to HAP's excellent customer services.

59.    Third, HAP has also had to reduce its margins to avoid even more lost sales. This caused it further damages.

60.    Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement, Certification of Settlement Class, and Related Relief in *The Shane Group, Inc. et al v. Blue Cross Blue Shield of Michigan*, 10-cv-14360-DPH-MKM, states that purchases by HAP, among a few others, "are the purchases for which Plaintiffs

have the best evidence of impact and for which Dr. Leitzinger [Class Plaintiffs'
expert] had (preliminarily) measured damages." *Id.* at pp.22-23.

61.     The foregoing categories of damages understate the impact on HAP of
Blue Cross' MFN plus clauses.  Those damages reflect the direct, differential
effect on HAP from higher rates from providers as a result of the MFN plus
clauses.  They do not reflect the harm to HAP from two indirect, but clear and
important, effects of the MFN plus clauses.  First, by increasing prices at the major
providers subject to the MFN plus clauses, Blue Cross' actions have lessened
competitive pricing pressure on other hospitals, whose prices have also been
increased as a result of the MFN plus clauses.  Second, by increasing Blue Cross'
market position relative to its competitors, the MFN plus clauses have allowed
Blue Cross to exploit its market position by putting further pressure on hospitals to
favor Blue Cross at the expense of other insurers.

62.     In addition, Blue Cross' frequent and widespread communications
regarding its purchase price advantage (resulting from the MFN plus clauses)
caused serious harm to HAP's reputation.  In fact, due to the MFN plus clauses,
HAP gained a reputation in the market place as offering higher cost products.  As a
result, many insurance agents who previously had strong regular relationships with
HAP, frequently quoting HAP offers to their clients, began to quote HAP to their
clients less frequently, or completely stopped quoting HAP to their clients.  Many

of these agents communicated to HAP that quoting HAP was a waste of time because of its uncompetitive provider costs. Additionally, for this reason, many employers no longer had an interest in obtaining coverage from HAP.

63.    This was especially significant, because there was widespread interest among agents for alternatives to Blue Cross. The interest would have resulted in substantially more competition but for Blue Cross' exclusionary actions.

64.    As a result, HAP was substantially damaged because of this loss of the opportunity to have agents quote to many prospective customers. However, because of the nature of the harm, it is impossible for HAP to accurately calculate how much additional damages it suffered due to this serious loss of reputation and good will.

65.    These lost sales and loss of reputation and goodwill substantially enhanced Blue Cross' already dominant market position in the relevant commercial insurance market and have helped Blue Cross maintain its existing dominance, which would have otherwise eroded significantly. These lost sales have resulted in a higher market share for Blue Cross, and lower market share for HAP. They have further weakened HAP's role as the most significant competitive constraint to Blue Cross in the relevant market.

66.    HAP also faced serious difficulties for many years in expanding its operations beyond the Detroit metropolitan area. This may have been due in

27

significant part in various locations due to the presence of MFN plus clauses. HAP reserves the right to amend this complaint to add additional allegations concerning possible competitive harm in such locations as a result of HAP's review of the discovery record.

67.     HAP has suffered these damages since at least 2008. Any applicable statute of limitations has been tolled by the pendency of *The Shane Group, Inc. et al v. Blue Cross Blue Shield of Michigan.*

**COUNT I**
**<u>Unlawful Agreement in Violation of Sherman Act § 1</u>**

68.     HAP repeats and realleges the allegations of paragraphs 1 through 67 above.

69.     Each of the provider agreements between Blue Cross and a Michigan hospital containing an MFN plus provision is a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

70.     Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets as set forth above.

71.     Each of the agreements between Blue Cross and a hospital in Michigan containing an MFN plus clause unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

72.     HAP has been injured thereby in its business and property.

## COUNT II
## <u>Violation of MCL 445.772</u>

73.     HAP repeats and realleges the allegations of paragraphs 1 through 72 above.

74.     Blue Cross entered into agreements with hospitals in Michigan that unreasonably restrained trade and commerce in violation of Section 2 of the Michigan Antitrust Reform Act, MCL 445.772.   Blue Cross' violations were flagrant, and justify treble damages.

75.     HAP has been injured thereby in its business and property.

## COUNT III
## <u>Monopolization</u>

76.     HAP restates and realleges the allegations in paragraphs 1 through 75 hereof as if fully stated herein.

77.     Blue Cross possesses and has possessed monopoly power in the relevant commercial insurance market and monopsony power in the relevant hospital services market.   Its actions set forth above constituted unlawful monopolization in violation of Section 2 of the Sherman Act.  15 U.S.C. § 2.

78.     Blue Cross' actions have injured HAP in its business and property.

79.     The actions of Blue Cross have substantially harmed competition and increased costs in the relevant markets.

8287275.44

## COUNT IV
## <u>Violation of MCL 445.773</u>

80.     HAP restates and realleges the allegations in paragraphs 1 through 79 hereof as if fully stated herein.

81.     Blue Cross' conduct violated MCL 445.773 as illegal monopolization.

## COUNT V
## <u>Tortious Interference With Prospective Advantage</u>

82.     HAP restates, and realleges paragraphs 1 through 81 above, as if fully set forth herein.

83.     HAP has had ongoing relationships with hundreds of employers who believed in the utility of, and regularly utilized, HAP's commercial insurance services.  As described above, consumers, who included the employees of HAP's employer customers, gave HAP the highest satisfaction ratings.  HAP had a reasonable business expectancy of obtaining continuing business from these employers, who typically continued to use HAP for five years or more after initially contracting with it.  There is a high likelihood that HAP would have retained these relationships but for Blue Cross' interference.

84.     HAP also had a reasonable expectancy of obtaining business from hundreds of additional employers.  These employers were interested in HAP's products and services as an alternative source of health insurance for their employees.  They engaged in discussions with HAP representatives and contracted

8287275.44

independent agents concerning their entry into a contract with HAP, but did not choose HAP due to price. Given these expressions of interest, HAP's sales efforts with these customers, HAP's improvements in its network, product offerings and breadth of agency relationships discussed above, HAP's very high consumer satisfaction ratings and HAP's status as the primary alternative to Blue Cross in the Detroit metropolitan area, there is a high likelihood that HAP would have obtained substantial business from these prospective customers but for Blue Cross' interference, and, at the very least, a reasonable likelihood that HAP would have established ongoing relationships with these employers on whom it called.

85.   HAP also had strong relationships with many insurance agents who regularly quoted HAP health insurance offers to their clients because they believed that HAP offered those clients a strong provider network, excellent services and good prices. These agents were also aware of HAP's outstanding customer satisfaction ratings. As a result, HAP had a reasonable business expectancy of obtaining continuing business through these insurance agents. There is a high likelihood that HAP would have retained these relationships but for Blue Cross' interference.

86.   Blue Cross was aware of these relationships and expectancies.

87.   Blue Cross knowingly, willfully and wrongfully interfered with HAP's prospective economic relationship with such employers and agents without

privilege or justification through the acts described above.  Blue Cross' wrongful conduct consisted of anticompetitive pressure on hospitals to adopt MFN plus clauses which resulted in interference with HAP's customers and prospective customers.

88.     Blue Cross' actions as described above constituted unlawful conduct. Blue Cross has acted anticompetitively, improperly and unethically.   HAP's anticompetitive conduct was malicious, unjustified and improper.

89.     Blue Cross' intentional and improper interference has damaged HAP.

90.     Blue Cross' actions described above have also seriously harmed HAP's reputation and goodwill, and have thereby substantially interfered with HAP's expectancies and business relationships with insurance agents and employers.

91.     HAP is entitled to both actual damages due to lost sales and to exemplary damages for such harm to its reputation and goodwill.

## Relief Requested

WHEREFORE, Plaintiffs request that this Honorable Court:

>    a.     Award Plaintiffs three times their actual damages suffered, as well as their reasonable costs and attorneys' fees;

>    b.     Award Plaintiffs exemplary damages for the substantial harm to their reputation and goodwill described above; and

8287275.44

c.      Award such other relief as this Court finds just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

s/David A. Ettinger
Honigman Miller Schwartz & Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
(313) 465-7368 (p)
(313) 465-7369 (f)
dettinger@honigman.com
(P26537)

Dated: October 1, 2014

8287275.44